UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

HELENE NAKIS,                           :

                        Plaintiff,      :     03 Civ. 8604 (HBP)

      -against-                         :
                                              OPINION
JOHN E. POTTER, Postmaster              :     AND ORDER
General, United States
Postal Service,                         :

                        Defendant.      :

----------------------------------X


            PITMAN, United States Magistrate Judge:


I.  Introduction


            This is an employment discrimination action brought

under the Age Discrimination in Employment Act of 1967 ("ADEA"),

29 U.S.C. §§ 621 et seq., the Rehabilitation Act of 1967, 29

U.S.C. §§ 701 et seq. and Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq.  Plaintiff, a

former employee of the United States Postal Service (the "Postal

Service"), alleges that due to her age, disability and prior

Equal Employment Opportunity ("EEO") activity, she was subjected

to numerous acts of disparate treatment, retaliation and was

constructively discharged.  The parties have consented to my

exercising plenary jurisdiction over this action pursuant to 28

U.S.C. § 636(c).

Defendant moves for summary judgment dismissing the complaint on a variety of different grounds. For the reasons set forth below, defendant's motion is granted in all respects.

II. Facts

Plaintiff's employment history and much of the background surrounding plaintiff's claims are contained in my Opinion and Order in Nakis v. Potter, 01 Civ. 10047 (HBP), 2004 WL 2903718 at *1-*7 (S.D.N.Y. Dec. 15, 2004) ("Nakis I"), familiarity with which is assumed. Nakis I dealt with the allegations contained in plaintiff's 1998 and 1999 EEO complaints, while this action involves the claims asserted in plaintiff's January 21, 2000 EEO complaint ("2000 EEO Complaint"). I reiterate here only those facts from Nakis I that are relevant to the disposition of the pending motion.

A. Events Giving Rise to Plaintiff's
Claims in Her 2000 EEO Complaint

1. Plaintiff's Relocation to Another
Cubicle and the Reassignment of Her
Desk to a Younger, Non-Disabled, Male Employee

In March 1999, plaintiff had a disagreement with a co-worker -- Harold "Bud" Keller -- concerning a window in an office they shared; plaintiff claimed it was open too wide and created a draft (Transcript of the Deposition of Helene Nakis,

2

taken October 29, 2004, at 98, 102-03, 110, annexed as Ex. EA ("O'Toole Ex. EA") to the Declaration of Andrew D. O'Toole, dated June 14, 2005 ("O'Toole Decl."); E-mail from Plaintiff to Mark Stein dated March 4, 1999, annexed as Ex. BT ("O'Toole Ex. BT") to the O'Toole Decl.). Plaintiff spoke to her immediate supervisor, Mark Stein, about the incident, and Stein, in turn, spoke with Keller (O'Toole Ex. BT). The following morning, March 4, 1999, Keller approached plaintiff at her desk and asked: "Helene, don't you have any work to do? Just go stick your nose to the screen." Plaintiff responded: "What right do you have to talk to me like that?" He replied: "Because I'm a supervisor." At that point, plaintiff responded: "Not mine, you are not." Plaintiff alleges that Keller came closer to her cubicle and stated: "Oh yeah, you see what's going to happen, just wait and see" (O'Toole Ex. BT).

Sometime in March 1999, Stein informed plaintiff that he was moving her desk to a nearby cubicle as a result of the dispute over the window draft (O'Toole Ex. EA at 104-10). However, before her desk could be moved, plaintiff filed an injury claim alleging that she experienced traumatic stress due to alleged harassment by Stein when he denied plaintiff's request for annual leave (Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation, dated March 19, 1999, annexed as Ex. AM to the O'Toole Decl.; Complaint ¶ 21).

As a result of the claimed stress, plaintiff did not attend work from March 10, 1999 through August 16, 1999 (O'Toole Ex. EA at 107; Exhibit B to Stein Decl.).

When plaintiff returned work in August 1999, she was informed that her work station had been moved to a cubicle in the middle of the office (O'Toole Ex. EA at 84-85, 114-15). Plaintiff alleges that Stein did not personally inform her of relocation when she returned; rather, a co-worker told her where her new desk would be (O'Toole Ex. EA at 116-18). Plaintiff made no complaint about the relocation of her work station and, moreover, Stein approved plaintiff's subsequent request to relocate to another desk within the same cubicle (O'Toole Ex. EA at 118-19). Plaintiff, however, complained that her new location was isolating, did not afford her as much opportunity to interact with and learn from her co-workers and was located too close to the office's facsimile machines and printers (O'Toole Ex. EA at 109-10).

Plaintiff also claims that, upon her return to work, Richard Capobianco -- a younger, non-disabled, male employee -- occupied the desk she had occupied prior to her March 1999 leave of absence (O'Toole Ex. EA at 112-13).

2.    The Deletion of Plaintiff's Name from an
              <u>E-mail List During Her Six-Month Absence</u>

        Plaintiff further alleges that her computer had been
tampered with during her six-month absence because her name had
been deleted from an e-mail distribution list (O'Toole Ex. EA at
174-76).  Plaintiff notified Michael J. Farrell, Manager of
Distribution Networks of the deletion and, within a day, plain-
tiff's name was restored to the e-mail distribution list (O'Toole
Ex. EA at 174-76; E-mails from Plaintiff to Farrell and from
Farrell to Plaintiff, dated August 26, 1999 annexed as Ex. BV to
the O'Toole Decl.).

        3.    Plaintiff Was Denied Permission to
              <u>Retake an Excel Class She Already Attended</u>

        In early 1998, plaintiff attended five, eight-hour
computer training courses, including a February 4, 1998 course on
Excel 7.0 for Windows 95 (Transcript of the Deposition of Helene
Nakis, taken June 16, 2003 at 771-73, annexed as Ex. A ("O'Toole
Ex. A") to the O'Toole Decl.; Certificates of Completion from
Productivity Point, annexed as Ex. AX to the O'Toole Decl.).

        On or about September 23, 1999, Stein refused to allow
plaintiff to retake the same Excel course because she had failed
to inform Stein that she had taken the course already (O'Toole
Ex. A at 783-84).  Plaintiff claims that Stein accused her of

lying about whether she had taken the Excel course previously (O'Toole Ex. A at 785). By letter dated October 4, 1999, Stein advised plaintiff that one of plaintiff's co-workers -- Gerald Ross -- was willing to assist her with Excel (Letter from Mark Stein to Plaintiff, dated October 4, 1999, annexed as Ex. BC to the O'Toole Decl.).

    4.   The Adequacy of the
          <u>Lighting at Plaintiff's Desk</u>

On September 24, 1999, plaintiff had an argument with Stein concerning the adequacy of the lighting at plaintiff's desk (Letter from plaintiff to Mark Stein, dated September 25, 1999, annexed as Ex. BW ("O'Toole Ex. BW") to the O'Toole Decl.).

Plaintiff claims that a florescent light over her desk needed to be replaced because it was flickering (O'Toole Ex. BW). Nakis alleges that, while Stein was inquiring into the light's location and the frequency of the flickering, he told her: "You do not need more light, you have desk lamp" (O'Toole Ex. BW). Plaintiff also contends that Stein harassed her by saying: "What do you need more light for? You have no work. You have no assignments" (O'Toole Ex. BW).

5.    Various Disputes with Farrell, Lee
      and Stein During Plaintiff's Last Week
      of Work and Comments Concerning Plaintiff's Age

Also during the week of September 24, 1999, plaintiff had an argument with Michael Farrell's secretary -- Carol Lee -- concerning plaintiff's time records.  When Stein approached Lee concerning the matter, plaintiff also approached Lee's desk.  Lee told plaintiff, "I do not take orders from you.  I take orders from Mark Stein.  He is my supervisor."  Stein then said to plaintiff in a loud voice, "I am giving you a direct order.  Go back to your desk, now!"  Plaintiff replied, "Yes sir, Mr. Stein.  I will obey your direct order and go to my desk."  Plaintiff took great offense at receiving a direct order in "full view" of the secretarial staff (Letter from Plaintiff to Mark Stein, dated September 27, 1999, annexed as Ex. BX to the O'Toole Decl.).

On September 29, 1999, plaintiff had another heated conversation with Lee concerning the manner in which Lee had signed for a certified letter.  Plaintiff alleges that Lee told another postal employee, "[T]ell this person who always creates problems to go to hell" during some petty exchanges concerning the matter.  Plaintiff then complained to Farrell who told plaintiff that she "should not send so many [c]ertified letters, and that some of these subjects could be handled by talking, [instead]."  Farrell also told plaintiff that she "cannot tell people what to do."  After speaking to Mr. Farrell, plaintiff

7

sought medical attention for elevated blood pressure and left work on September 29, 1999, never to return (Letter from Plaintiff to Mark Stein, dated October 2, 1999, annexed as Ex. BY to the O'Toole Decl.).

Plaintiff also claims that Robert Cossaro, a Postal Service human resources specialist, made the following comments about plaintiff's age in or about January 1999: "Your bones are getting old, Helene. . . . You have the age. Why don't you get out." (O'Toole Ex. A at 857-59; O'Toole Ex. EA at 149-51). Plaintiff further alleges that in or around March 1999 and September 1999 both Farrell and Stein commented that plaintiff had the requisite age and years of service and asked her why she did not retire (O'Toole Ex. A at 859-60; O'Toole Ex. EA at 148, 151-52).

6.  Alleged Mishandling of Plaintiff's
    1998 EEO Complaint and Falsification
    of Records Concerning Her OWCP Claims

Plaintiff makes the broad and unspecified averment that the Postal Service mishandled and "totally twisted around" her 1998 EEO complaint (EEO Complaint of Discrimination in the Postal Service, dated January 21, 2000, annexed as Ex. BP ("O'Toole Ex. BP") to the O'Toole Decl., at PL00546; O'Toole Ex. A at 1036-40). She further contends that the Postal Service submitted false statements when it controverted her Department of Labor Office of

8

Workers Compensation Programs ("OWCP") claims.  Plaintiff's 2000

EEO Complaint states that Cossaro falsified records pertaining to

her May 11, 1998 OWCP claim (O'Toole Ex. BP at PL00543, PL00545;

O'Toole Ex. EA at 245-48).  The Department of Labor never found

that any of records the Postal Service filed in connection with

plaintiff's OWCP claims were falsified (O'Toole Ex. EA at 188,

246-48), nor has plaintiff submitted evidence substantiating her

claims.

> 7.  The Postal Service Demanded that Plaintiff Pay
>     For the Annual Leave She Requested to Buy Back

In August 1999, plaintiff requested to buy back the

annual leave used during her absence from March 1999 through

August 1999 (Letter from Plaintiff to Mark Stein, dated August

29, 1999, annexed as Ex. CO ("O'Toole Ex. CO") to the O'Toole

Decl.).  Since plaintiff had been compensated during her absence

and her annual leave charged, she was required to "buy back" or

pay for the annual leave if she wished to have it restored

(O'Toole Ex. CO).  Specifically, plaintiff requested to buy back

her annual leave by having $300 deducted from each of her future

pay checks (Letter from Plaintiff to Mark Stein, dated September

9, 1999, annexed as Ex. CP to the O'Toole Decl.).

In November 1999, the Postal Service issued plaintiff

an invoice setting forth the amount plaintiff was required to pay

in order to buy back her annual leave (Invoice, dated November

27, 1999, annexed as Ex. CQ to the O'Toole Decl.). Plaintiff did not pay the invoice and the Postal Service notified plaintiff that it would deduct $298 from her future pay checks (Letter from Mark Stein to Plaintiff, dated December 13, 1999, annexed as Ex. CR to the O'Toole Decl.; Letter from Mark Stein to Plaintiff, dated January 18, 2000, annexed as Ex. CS to the O'Toole Decl.; Letter from Mark Stein to Plaintiff, dated January 25, 2000, annexed as Ex. CT to the O'Toole Decl.; Letter from Mark Stein to Plaintiff, dated March 1, 2000, annexed as Ex. CU to the O'Toole Decl.; Letter from Mark Stein to Plaintiff, dated April 3, 2000, annexed as Ex. CV to the O'Toole Decl.; Letter from Maureen Ryan to Plaintiff, dated September 14, 2000, annexed as Ex. CW to the O'Toole Decl.).

In November 2000, plaintiff paid the full amount necessary to buy back her annual leave (Letter from Plaintiff to Postal Service Disbursement Office, dated November 2, 2000, annexed as Ex. CX to the O'Toole Decl.; Facsimile from Plaintiff to Office of Personal Management ("OPM"), dated January 22, 2001, annexed as Ex. CY to the O'Toole Decl.).

8. Plaintiff's Alleged Deprivation of
   Information About Her Disability Annuity

Following her on-the-job back injury in June 1980, plaintiff elected to receive benefits from the Department of Labor's OWCP pursuant to the Federal Employment Compensation Act

("FECA"), in lieu of the disability annuity approved by the Office of Personal Management ("OPM") (Letter from Plaintiff to the Postal Service, Human Resources Management Branch, dated June 21, 1985, annexed as Ex. J to the O'Toole Decl.). Plaintiff received disability benefits from OWCP from January 1984 through October 1997 (Decision and Order of the Employees' Compensation Appeals Board ("ECAB"), dated March 15, 2001, at US00095, annexed as Ex. D to the O'Toole Decl.).

In 1996, the OWCP concluded that plaintiff was well enough to return to work (O'Toole Ex. A at 257-58, 304). On October 25, 1997, plaintiff was rehired, (Notice of Personnel Action, dated October 25, 1997, annexed as Ex. O to the O'Toole Decl.), and plaintiff returned to work on December 22, 1997 (O'Toole Ex. A at 650-51). In January 1998, OPM determined that plaintiff was considered a "reemployed annuitant" because she was not "administratively recovered" from her back jury. Thus, plaintiff was eligible to receive the disability retirement annuity approved by OPM in 1985, as well as a supplemental annuity if she worked at least one year following her employment (Letter from OPM to Robert Cossaro, dated January 27, 1998, annexed as Ex. CA to the O'Toole Decl.; CSRS and FERS Handbook, April 1998, Ch. 102, § 102A4.1.1 Job Aids, annexed as Ex. CB to the O'Toole Decl. at US0024185).

In early 1999, plaintiff requested more information about her disability retirement annuity. Based on her request, the Postal Service began preparing a manual estimate of her supplemental annuity, which was complicated by the need to obtain certain employment records dating back to 1980, such as the OWCP records concerning plaintiff's worker's compensation status and her 1985 disability retirement annuity (Letter from Paul Tartaglia to Plaintiff, dated February 22, 1999, annexed as Ex. DC to the O'Toole Decl.; Letter from Paul Tartaglia to Plaintiff, dated April 8, 1999, annexed as Ex. DD to the O'Toole Decl.).

In August 1999, OPM provided plaintiff with a non-binding estimate of her disability annuity (Letter from OPM to Plaintiff, dated August 17, 1999, annexed as Ex. DE to the O'Toole Decl.). In May 2000, the Postal Service provided plaintiff with a non-binding estimate of her supplemental annuity (Letter from Paul Tartaglia to Plaintiff, dated May 12, 2000, annexed as Ex. CC to the O'Toole Decl.; Letter from Paul Tartaglia to Plaintiff, dated June 26, 2000, annexed as Ex. DG to the O'Toole Decl.). In its May 2000 letter, the Postal Service stated that based on OPM's 1998 determination, which found that plaintiff was considered a "reemployed annuitant," plaintiff was entitled to a disability retirement annuity and a supplemental annuity, but that she was not eligible for voluntary retirement (O'Toole Ex. CC).

12

In July 2000, plaintiff informed the Postal Service that she wished to voluntarily retire (Letter from Plaintiff to Paul Taraglia, dated July 10, 2000, annexed as Ex. CE to the O'Toole Decl.). In response to plaintiff's request, OPM reiterated that plaintiff was not eligible for voluntary retirement because she was considered a "reemployed annuitant" and had never requested to be found fully recovered from her disability (Letter from OPM to Raymond Ming, dated July 28, 2000, annexed as Ex. CF to the O'Toole Decl.).

However, on August 8, 2000, OPM reversed its 1998 finding that plaintiff was a "reemployed annuitant." Rather, OPM determined that plaintiff would be deemed fully recovered as of the date she returned to work in 1997 and, therefore, was not entitled to a disability retirement. Instead, plaintiff could apply for voluntary retirement (Letter from OPM to Plaintiff, dated August 8, 2000, annexed as Ex. BK to the O'Toole Decl.; Letter from OPM to Raymond Ming, dated August 8, 2000, annexed as Ex. CG to the O'Toole Decl.). On August 29, 2000, plaintiff submitted her application for immediate retirement (Application for Immediate Retirement, dated August 29, 2000, annexed as Ex. CH to the O'Toole Decl.). Plaintiff claims that she never received OPM's August 8, 2000 letter (Affidavit of Helen Nakis, sworn to July 9, 2005 ("Nakis Aff."), at ¶ 59, annexed as Exhibit B to Kousoulas Decl.).

9.   Plaintiff's Alleged
     <u>Constructive Discharge</u>

Finally, plaintiff claims that she was constructively discharged from her position with the Postal Service (Compl. ¶ 24).  Specifically, plaintiff alleges that after leaving work on September 29, 1999, having been found "not fit for duty -- before end of tour," she was unable to return to work because of "the pain to her back and leg, which was exacerbated by the stress she experienced at the work-place, and her elevated blood pressure, anxiety and depression," which she alleges were caused by a hostile work environment.  As a result, plaintiff alleges that she was compelled to request an early retirement from the Postal Service in September of 2000 (Compl. ¶ 24).

B.   <u>Procedural History</u>

On October 21, 1999, plaintiff contacted an EEO Counselor for informal counseling concerning the alleged acts of discrimination described above (O'Toole Ex. A at 856; O'Toole Ex. EA at 125; Informal Complaint of Discrimination, signed by plaintiff on January 10, 2000, annexed as Ex. BP to the O'Toole Decl.).  On January 21, 2000, plaintiff filed her 2000 EEO Complaint, in which she formally raised the above-described claims (EEO Complaint of Discrimination in the Postal Service, dated January 21, 2000, annexed as Ex. BQ to the O'Toole Decl.).

14

The Postal Service issued its final agency decision concerning plaintiff's 2000 EEO Complaint on August 1, 2003; it concluded that all of plaintiff's claims of discrimination and retaliation failed on the merits (Notice of Final Decision, dated August 1, 2003, annexed as Ex. BR to the O'Toole Decl.).

On November 30, 2003, plaintiff commenced this action based on the allegations contained in her 2000 EEO Complaint, asserting claims for: (1) discrimination based on the failure to reasonably accommodate plaintiff's disability, in violation of the Rehabilitation Act (Count One); (2) retaliation for plaintiff's prior disability-related EEO activity, in violation of the Rehabilitation Act (Court Two), and (3) discrimination based on plaintiff's age, in violation of the ADEA (Count Five). Plaintiff's claim of sex discrimination under Title VII (Count Four) has been voluntarily dismissed. <u>See</u> Stipulation and Order, dated June 14, 2005 (Docket Item 19). In addition, plaintiff appears to have withdrawn her Title VII retaliation claim (Count Three), just as she did in <u>Nakis I</u> (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated July 18, 2005 ("Pl. Mem."), at 23). All discovery in this matter is now complete.

III.  Analysis

    A.  Summary Judgment Standard

      The standards applicable to a motion for summary judgment, as set forth in Nakis I, supra, 2004 WL 2903718 at *8-*9, are well-settled and require only brief review.

> Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  This form of relief is appropriate when, after discovery, the party -- here plaintiff -- against whom summary judgment is sought, has not shown that evidence of an essential element of her case -- one on which she has the burden of proof -- exists.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  This form of remedy is inappropriate when the issue to be resolved is both genuine and related to a disputed material fact.  An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990). Moreover, the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
>
> If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with "specific facts showing that there is a genuine issue for trial."  Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993).  If the nonmovant fails to meet this burden, summary judgment will be granted against it.

Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004); accord Jeffreys v. City of New York, 426 F.3d 549, 553-54

(2d Cir. 2005); Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223-24 (2d Cir. 1994). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. . . . In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Stated more succinctly, '[t]he evidence of the non-movant is to be believed.'" Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 253-54 (2d Cir. 2002) (citations omitted). See also Jeffreys v. City of New York, supra, 426 F.3d at 553 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); accord Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004); Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

Summary judgment is "ordinarily inappropriate" in employment discrimination cases where the employer's intent and state of mind are in dispute. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000); Cifarelli v. Village of Babylon, 93 F.3d 47, 54 (2d Cir. 1996). See Gallo v. Prudential Residential Servs., supra, 22 F.3d at 1224; Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 103 (2d Cir. 1989); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Moreover, in discrimination cases

> summary judgment may not be granted simply because the
> court believes that the plaintiff will be unable to
> meet his or her burden of persuasion at trial.  There
> must either be a lack of evidence in support of the
> plaintiff's position, or the evidence must be so over-
> whelmingly tilted in one direction that any contrary
> finding would constitute clear error.

Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998)

(citations omitted).  See Weber v. Parfums Givenchy, Inc., 49 F.

Supp.2d 343, 354 (S.D.N.Y. 1999).

Although the central role of intent requires that

caution be exercised in addressing a summary judgment motion made

in a discrimination case, "'the salutary purposes of summary

judgment -- avoiding protracted, expensive and harassing trials

-- apply no less to discrimination cases than to . . . other

areas of litigation.'"  Abdu-Brisson v. Delta Air Lines, Inc.,

239 F.3d 456, 466 (2d Cir. 2001), quoting Meiri v. Dacon, supra,

759 F.2d at 998.  Thus, the Court of Appeals for the Second

Circuit has expressly "remind[ed the] district courts that the

'impression that summary judgment is unavailable to defendants in

discrimination cases is unsupportable.'"  Weinstock v. Columbia

Univ., 224 F.3d 33, 41 (2d Cir. 2000), quoting McLee v. Chrysler

Corp., 38 F.3d 67, 68 (2d Cir. 1994).  See generally, e.g.,

Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 88 (2d

Cir. 2001) (affirming a grant of summary judgment in an ADEA

discrimination case); Boos v. Runyon, 201 F.3d 178, 180 (2d Cir.

2000) (affirming a grant of summary judgment in a disability

discrimination case brought under the Rehabilitation Act).

B.    Timeliness and Exhaustion of
      Administrative Remedies of Plaintiff's Claims

      1.    ADEA and Rehabilitation
            Act Claims Occurring Before
            September 6, 1999 Are Time-Barred

Defendant first contends, making a parallel argument to

the one raised in Nakis I, that plaintiff's ADEA and Rehabilita-

tion Act claims based on conduct occurring before September 6,

1999 -- the 45th day before plaintiff first sought EEO counseling

-- must be dismissed because plaintiff did not timely raise and

exhaust such claims in her administrative proceedings (Memorandum

of Law in Support of Defendant's Motion for Summary Judgment,

dated June 14, 2005 ("Def. Mem.") at 15-16).

As discussed in Nakis I, supra, 2004 WL 2903718 at *9-

*11, Title 29 of the Code of Federal Regulations, Section

1614.105(a)(1), requires a plaintiff bringing claims against the

federal government under both the ADEA and the Rehabilitation Act

to exhaust administrative remedies within a certain time frame

prior to bringing a claim in federal court.  Failure to exhaust

in a timely manner results in a claim being time-barred, subject

to certain equitable tolls.  As the Honorable Guido Calabresi,

United States Circuit Judge, explained in <u>Boos v. Runyon</u>, <u>supra</u>, 201 F.3d at 181:

> EEOC regulations require an employee suing the federal government under the Rehabilitation Act to exhaust certain administrative remedies before initiating a suit in the district court. Thus, an aggrieved agency employee must first seek EEO counseling within forty-five days of the allegedly discriminatory act. <u>See</u> 29 C.F.R. § 1614.105(a)(1). The employee must then file an EEO complaint with "the agency that allegedly discriminated against the complainant." <u>Id</u>. § 1614.106. Within ninety days of that agency's final decision, or after the passage of 180 days from the filing of the complaint with the agency if no final decision has yet been rendered, the complainant may file suit in federal court. <u>See id</u>. § 1614.408.

<u>See</u> <u>also</u> <u>Briones v. Runyon</u>, 101 F.3d 287, 289-90 (2d Cir. 1996) (in the context of Title VII, the failure to bring a claim within the required time period "ordinarily . . . preclude[s] a plaintiff from pursuing a discrimination claim in federal court."); <u>Marinelli v. Chao</u>, 222 F. Supp.2d 402, 415-16 (S.D.N.Y. 2002) (explaining that "exhaustion of administrative remedies is a precondition to civil suit under both the Rehabilitation Act and the ADEA"). <u>Accord</u> <u>Torres v. United States Dep't of Veteran Affairs</u>, 02 Civ. 9601 (HBP), 2004 WL 691237 at *4 (S.D.N.Y. Mar. 31, 2004); <u>Padilla v. Potter</u>, 03-CV-6074 (JBW), 2004 WL 3090591 at *2 (E.D.N.Y. July 22, 2004); <u>Fridia v. Henderson</u>, 99 Civ. 10749 (BSJ), 2000 WL 1772779 at *9 (S.D.N.Y. Nov. 30, 2000); <u>Lynk v. Henderson</u>, 98 Civ. 2086 (MGC), 2000 WL 178859 at *5 (S.D.N.Y. Feb. 15, 2000); <u>Baber v. Runyon</u>, 97 Civ. 4798 (DLC), 1998 WL 912065 at *2-*3 (S.D.N.Y. Dec. 30, 1998); <u>Dillard v. Runyon</u>, 928

F. Supp. 1316, 1323 (S.D.N.Y. 1996), aff'd without published opinion, 108 F.3d 1369 (2d Cir. 1997).

Plaintiff first sought EEO counseling with respect to the claims in her 2000 EEO Complaint on October 21, 1999 (O'Toole Ex. EA at 125; Informal Complaint of Discrimination, signed by plaintiff on January 10, 2000, annexed as Ex. BP to the O'Toole Decl.) and first filed a formal complaint with the Postal Service on January 21, 2000 (EEO Complaint of Discrimination in the Postal Service, dated January 21, 2000, annexed as Ex. BQ to the O'Toole Decl.). Accordingly, defendant claims that all conduct occurring before September 6, 1999 -- i.e. more than 45 days prior to October 21, 1999 -- is time-barred.[1]

Plaintiff responds by making the same flawed argument she raised in Nakis I -- that conduct occurring before September 6, 1999 is actionable under the "continuing violation" theory (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated July 18, 2005 ("Pl. Mem."), at 4-7).

_____

[1]September 6, 1999 is the 45th day prior to October 21, 1999 -- the date plaintiff's first sought EEO counseling with respect to the claims in her 2000 EEO Complaint. Defendant miscalculates that September 9, 1999 is 45 days prior to the date plaintiff first sought EEO counseling (Def. Mem. at 15). Plaintiff also errs in concluding that "September 24, 1999 [is] 45 days before [plaintiff] contacted the EEO counsel on October 26, 1999 . . ." (Pl. Mem. at 7).

Prior to 2002, the continuing violation-doctrine permitted recovery for discriminatory conduct that occurred outside of the applicable limitations period if the conduct was part of a "practice or policy" of discrimination. See, e.g., Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001). However, the scope of the continuing violation doctrine was substantially restricted by the Supreme Court's decision in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002).[2] In that case the Supreme Court unanimously held that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." 536 U.S. at 114. The Court went on to identify "termination, failure to promote, denial of transfer, or refusal to hire" as examples of conduct that constituted a "discrete discriminatory act." 536 U.S. at 114. The Court did, however, note that a hostile work environment would support the application of the continuing violation doctrine because such a claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" 536 U.S. at 117. Thus, where a plaintiff alleges a hostile-environment claim, conduct outside the applicable limitations period could be

_____

[2]It is odd that plaintiff attempts to revive the continuing violation doctrine by citing only pre-Morgan authority in support of her arguments. Plaintiff's failure to address Morgan and its progeny is particularly bizarre given the fact that Nakis I addressed this very issue at length. See Nakis I, supra, 2004 WL 2903718 at *9-*11.

22

asserted so long as one act giving rise to the hostile-environ-
ment claim was within the limitations period.  536 U.S. at 117.
See also Forsyth v. Fed'n Employment & Guidance Serv., 409 F.3d
565, 572-73 (2d Cir. 2005) (noting Morgan's rule that "each
distinct discriminatory act starts the clock running again for
purposes of filing charges alleging that act"); Porter v. New
York Univ. School of Law, 392 F.3d 530, 532 (2d Cir. 2004) (per
curiam); Petrosino v. Bell Atlantic, 385 F.3d 210, 220 (2d Cir.
2004); Patterson v. County of Oneida, 375 F.3d 206, 220 (2d Cir.
2004); Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 133-35
(2d Cir. 2003).  Accord Trinidad v. New York City Dep't of
Correction, 04 Civ. 0326 (RJH), 2006 WL 704163 at *9, n.11
(S.D.N.Y. Mar. 21, 2006) ("As a general matter, the continuing
violation doctrine is heavily disfavored in the Second Circuit
and courts have been loath to apply it absent a showing of
compelling circumstances" (internal quotation marks omitted));
Cobian v. City of New York, 04 Civ. 1941 (GEL), 2006 WL 212292 at
*2, n.1 (S.D.N.Y. Jan. 24, 2006); Coleman v. B.G. Sulzle, Inc.,
402 F. Supp.2d 403, 411 (N.D.N.Y. 2005); Payne v. MTA New York
City Transit Auth., 349 F. Supp.2d 619, 624 (E.D.N.Y. 2004).

    Accordingly, except to the extent, if at all, that
pre-September 6, 1999 conduct evidences a hostile-environment
claim, plaintiff is precluded from asserting in this action any
pre-September 6, 1999 conduct by defendant as specific, compensa-

23

ble acts of discrimination or retaliation under the ADEA and/or the Rehabilitation Act.

Nevertheless, as plaintiff correctly notes, time-barred conduct may still be offered as evidence of discriminatory intent to support timely claims. National R.R. Passenger Corp. v. Morgan, supra, 536 U.S. at 102 ("[T]he statute [does not] bar an employee from using the prior acts as background evidence to support a timely claim."); Cobian v. City of New York, supra, 2006 WL 212292 at *2, n.1; see generally Fed.R.Evid. 404(b).

2.    Hostile-Environment Claim

Defendant also argues that because Nakis I already concluded that certain pre-September 6, 1999 conduct did not rise to the level of creating a hostile work environment, these incidents are, therefore, barred from being actionable in the present case (See Def. Mem. at 17, 24; Defendant's Reply Memorandum of Law, dated July 29, 2005 ("Def. Reply Mem.") at 3).

Plaintiff appears to concede, as she must, that I found in Nakis I that many of the same incidents raised in her 2000 EEO Complaint were insufficient to sustain a hostile environment claim (Pl. Memo. at 8; see also Nakis I, supra, 2004 WL 2903718 at *22-*26).  It is fundamental that plaintiff cannot re-litigate here issues that were resolved in Nakis I.  See Allen v. McCurry,

449 U.S. 90, 94 (1980) (discussing the doctrines of <u>res judicata</u> and collateral estoppel).

Therefore, plaintiff is precluded from asserting in this action any of the pre-September 6, 1999 events, raised in <u>Nakis I</u> and already found insufficient to establish a hostile-environment.  These events include:  (1) plaintiff being asked to retire rather than to remain in the workforce; (2) the Postal Services's refusal to correct leave errors in plaintiff's person-nel action forms; (3) Stein's berating plaintiff for leaving her station; (4) Stein's and Farrell's failing to take actions to create a safe and hostility-free environment for plaintiff; (5) Bud Keller's threatening plaintiff over the window draft inci-dent; (6) plaintiff's computer allegedly being tampering with; (7) the relocation of plaintiff's work station to a storage area where the copier and fax machine are maintained and where no other Network Distribution Specialists were assigned; (8) Stein's response to plaintiff over her request for the replacement of an overhead light, stating:  "What do you need more light for? You have no assignments," and (9) Carole Lee's berating plaintiff, warning her not to get on her "bad side," and telling her to go to hell.  <u>See</u> <u>Nakis I</u>, <u>supra</u>, 2004 WL 2903718 at *22-*26.

C.  <u>Plaintiff's Constructive Discharge Claim</u>

25

Defendant next seeks summary judgment dismissing plaintiff's constructive discharge claim (Def. Mem. at 16-22). Defendant makes two alternative arguments in support of this aspect of his motion: (1) because Nakis I already concluded that plaintiff had failed to demonstrate a hostile work environment, plaintiff's constructive discharge claim must also fail (Def. Mem. at 17) and (2), even if Nakis I did not preclude a constructive discharge claim, plaintiff cannot establish a prima facie case of constructive discharge (Def. Mem. at 17-22).

       1.    Affect of Plaintiff's
              Failed Hostile-Environment Claim
              on Her Constructive Discharge Claim

Plaintiff alleges in the current action that she suffered constructive discharge as a result of a hostile-environment (Compl. ¶ 24). Defendant first argues that because Nakis I held that plaintiff had failed to establish a hostile work environment, see Nakis I, supra, 2004 WL 2903718 at *22-*26, plaintiff's constructive discharge claim based on an allegedly hostile environment must also fail (Def. Mem. at 17).

In support of its argument, defendant cites the Supreme Court's decision in Pennsylvania State Police v. Suders, 542 U.S. 129, 149 (2004), in which the Court explained that it would be an anomaly to

26

> make the <u>graver</u> claim of hostile-environment construc-
> tive discharge <u>easier</u> to prove than its lesser included
> component, hostile work environment. . . .   Creation of
> a hostile work environment is a necessary predicate to
> a hostile-environment constructive discharge case.

(Emphasis in original).  Indeed, in order to establish a claim of

constructive discharge, plaintiff must establish "'working

conditions so intolerable that a reasonable person would have

felt compelled to resign.'"  <u>Arbaugh v. Y & H Corp.</u>, 126 S.Ct.

1235, 1240 n.6 (2006), <u>quoting</u> <u>Pennsylvania State Police v.</u>

<u>Suders</u>, 542 U.S. 129, 147 (2004); <u>see</u> <u>also</u> <u>Johnson v. Potter</u>,

04-CV-6634 (CJS), 2005 WL 2257436 at *15 (W.D.N.Y. Sept. 16,

2005) (explaining that in a retaliatory constructive discharge

case, "'a plaintiff must show that [she] was retaliated against

because of [her] E.E.O. activity and that retaliation constituted

intolerable working conditions in which a reasonable person in

similar circumstances would have felt compelled to resign.'"),

<u>citing</u> <u>Downey v. Isaac</u>, 622 F. Supp. 1125, 1133 (D.D.C. 1985).

   Thus, after <u>Suders</u> "[w]ithout an actionable hostile

environment claim, [a] plaintiff's constructive discharge claim

must also fail."  <u>Ferraro v. Kellwood Co.</u>, 03 Civ. 8492 (SAS),

2004 WL 2646619 at *11 (S.D.N.Y. Nov. 14, 2004), <u>aff'd</u>, <u>Ferraro</u>

<u>v. Kellwood Co</u>, -- F.3d --, --, 2006 WL 540340 (2d Cir. Mar. 7,

2006) (citing <u>Suders</u> and explaining that "[c]onstructive dis-

charge is regarded as an aggravated case of hostile work environ-

ment"); <u>see</u> <u>also</u> <u>Mandel v. Champion Intern. Corp.</u>, 361 F. Supp.2d

320, 327 (S.D.N.Y. 2005) ("The standard for constructive dis-
charge is even higher than that required to prevail on a hostile
environment claim."); Thomas v. Bergdorf Goodman, Inc., 03 Civ.
3066 (SAS), 2004 WL 2979960 at *9 (S.D.N.Y. Dec. 22, 2004)
(same).

Plaintiff's response merely adds fodder to defendant's
argument.  Plaintiff concedes two critical points:  (1) that
"several courts in this and other circuits . . . hold that in
order to prove a claim of constructive discharge a plaintiff must
demonstrate a greater severity or pervasiveness of harassment
than the minimum required to prove a hostile working environ-
ment," and (2) that plaintiff failed to establish her hostile
work environment claim in Nakis I (Pl. Memo. at 8).

Nonetheless, plaintiff then makes the bald assertion
that the question of whether a constructive discharge claim is an
aggravated case of hostile work environment remains unsettled in
this Circuit.  Plaintiff's proposition is unsupported by author-
ity and wholly without merit.  Plaintiff not only ignores Suders
and its progeny within this Circuit, see, e.g., Ferraro v.
Kellwood Co., supra, 2004 WL 2646619 at *11; Thomas v. Bergdorf
Goodman, Inc., supra, 2004 WL 2979960 at *9; Lloyd v. Bear
Stearns & Co., Inc., 99 Civ. 3323 (GBD), 2004 WL 2848536 at *15
(S.D.N.Y. Dec. 9, 2004), she also fails to acknowledge the wealth
of pre-Suders case law within this Circuit addressing this

28

precise issue and reaching the same conclusion the Supreme Court reached in <u>Suders</u>.  <u>See</u>, <u>e.g.</u>, <u>Greene v. Trustees of Columbia Univ.</u>, 234 F. Supp.2d 368, 381 (S.D.N.Y. 2002); <u>Bennett v. Watson Wyatt & Co.</u>, 136 F. Supp.2d 236, 250-51 (S.D.N.Y. 2001), <u>aff'd</u> <u>without</u> <u>published</u> <u>opinion</u>, 51 Fed. Appx. 55 (2d Cir. 2002); <u>Arroyo v. WestLB Admin., Inc.</u>, 54 F. Supp.2d 224, 231-32 (S.D.N.Y. 1999), <u>aff'd</u> <u>without</u> <u>published</u> <u>opinion</u>, 213 F.3d 625 (2d Cir. 2000).

Accordingly, based on the above authority, and to the extent that <u>Nakis I</u> dismissed plaintiff's hostile-environment claim, <u>see</u> <u>Nakis I</u>, <u>supra</u>, 2004 WL 2903718 at *22-*26, plaintiff's constructive discharge claim must also fail with respect to the events discussed in <u>Nakis I</u>.  Plaintiff cannot sustain the higher standard for showing hostile-environment constructive discharge with respect to the claims made in <u>Nakis I</u> if she failed to establish the lesser included claim of hostile-environment.  <u>See</u> <u>Pennsylvania State Police v. Suders</u>, <u>supra</u>, 542 U.S. at 146-50; <u>Mandel v. Champion Intern. Corp.</u>, <u>supra</u>, 361 F. Supp.2d at 327; <u>Ferraro v. Kellwood Co.</u>, <u>supra</u>, 2004 WL 2646619 at *11; <u>Thomas v. Bergdorf Goodman, Inc.</u>, <u>supra</u>, 2004 WL 2979960 at *9.

        2.   Plaintiff Has Failed to
           Establish a <u>Prima</u> <u>Facie</u> Case
           of Constructive Discharge Based

Defendant further argues that, notwithstanding, plaintiff's failure to establish a hostile-environment claim in Nakis I, plaintiff's constructive discharge claim must also be dismissed because plaintiff has failed to present any evidence from which a reasonable fact-finder could conclude that plaintiff was forced to retire involuntarily (Def. Mem. at 17-22).

To establish a prima facie case of unlawful termination under the ADEA, like Title VII, plaintiff must show:  (1) that she was qualified for the job, (2) that she was within the protected group, (3) that she was either actually or constructively discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination.  See Spence v. Maryland Cas. Co., 995 F.2d 1147, 1155 (2d Cir. 1993); Stetson v. NYNEX Serv. Co., 995 F.2d 355, 359 (2d Cir. 1993). Accord Kinsella v. Rumsfeld, 320 F.3d 309, 314 (2d Cir. 2003) (outlining the similar elements of a prima facie case of discriminatory termination in violation of the Rehabilitation Act), citing Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2d Cir. 1994); Frasure v. Principi, 367 F. Supp.2d 245, 255 (D. Conn. 2005) (outlining the similar elements of a prima facie case of retaliatory termination in violation of the Rehabilitation Act), citing Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).  Defendant challenges the third element of a prima facie

30

case, arguing that plaintiff cannot establish that she was constructive discharged.

The standard for establishing constructive discharge was outlined by the Court of Appeals for the Second Circuit in <u>Terry v. Ashcroft</u>, 336 F.3d 128, 151-52 (2d Cir. 2003):

> An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily. <u>Kirsch v. Fleet St., Ltd.</u>, 148 F.3d 149, 161 (2d Cir. 1998); <u>Chertkova v. Connecticut Gen. Life Ins. Co.</u>, 92 F.3d 81, 89 (2d Cir. 1996). We have explained that working conditions are intolerable when, viewed as a whole, they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." <u>Chertkova</u>, 92 F.3d at 89 (quotations omitted). In addition, to state a <u>prima facie</u> case of constructive discharge, [plaintiff] must establish that the constructive discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of [her] membership in [a protected] class." <u>Id.</u> at 91. Proof of such a causal connection "can be established 'directly through evidence of retaliatory animus directed against a plaintiff,' or 'indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . through other evidence such as disparate treatment of fellow employees who engaged in similar conduct.'" <u>Richardson</u>, 180 F.3d at 444 (<u>quoting</u> <u>DeCintio v. Westchester County Med. Ctr.</u>, 821 F.2d 111, 115 (2d Cir. 1987)).

<u>See also</u> <u>Petrosino v. Bell Atlantic</u>, <u>supra</u>, 385 F.3d at 229-30; <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 73 (2d Cir. 2000); <u>Pena v. Brattleboro Retreat</u>, 702 F.2d 322, 325 (2d Cir. 1983).

The Second Circuit has further explained:

> Unless the evidence is sufficient to permit a rational trier of fact to find that the employer delib-

erately created working conditions that were "'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, a claim of constructive discharge should be dismissed as a matter of law . . . .

Spence v. Maryland Cas. Co., supra, 995 F.2d at 1156 (internal citations omitted).

In response to defendant's argument, plaintiff cites to two e-mails from Paul Tartaglia, Manager of Human Resources, as evidence of the Postal Services's discriminatory intention to force her to retire (See Pl. Mem. at 10-12; E-mail from Paul Tartaglia to David Duffin, dated August 29, 1997 ("8/97 Tartaglia E-mail"), annexed as Exhibit E to the Declaration of Antonia Kousoulas, Esq., dated July 18, 2005 ("Kousoulas Decl."); E-mail from Paul Tartaglia to Robert Cossaro, dated January 12, 1998 ("1/98 Tartaglia E-mail"), annexed as Exhibit G to Kousoulas Decl.)). In the first e-mail, Tartaglia states:

> As you will recall about six months ago we spoke to you about the return to work for the DNO a Ms. Helene Nakis Batos; a former EAS-18 Logistics employee of the old Northeast Region who has been on Workmen's Compensation for some odd 11 or 12 years.

> We have spent countless hours and considerable money for doctor [sic] exams to get the Department of Labor to challenge Ms. Nakis Batos' claims of Disability.

> The Department of Labor has advised that while initially they believed Ms. Nakis Batos was going to drop her claim voluntarily, she has, up to this time, not carried forth her end of the bargain. Therefore, the next step is to bring her back to work.

Mr. Bob Cossaro of Injury Compensation will contact you to arrange the hours, days off and work tasks she will be able to perform (basically she can perform most office work except bending to file).

We have no options -- either we return her to work or she stays home indefinitely collecting approximately $30,000 in compensation until she dies. That $30,000 comes out of yours and my EVA!

(8/97 Tartaglia E-mail). In the second e-mail, Tartaglia states:

I have read your several messages on H. Nakis. I accept the basic premise that she is "trying to beat the system."

You must resist the temptation to "get her" and instead appear gracious at every turn. Get her an orthopedic desk and chair; change her schedule, set up the training ASAP; etc. My point is -- she will see she can't beat us back and possibly retire.

Notwithstanding the foregoing, I would still contact Eddie to pursue your theory of other employment.

Good luck! Patience is a virtue.

(1/98 Tartaglia E-mail).

Plaintiff also offers certain comments by Cossaro and Farrell as evidence of the Postal Services's discriminatory intention to force her to retire, namely: (1) on or about October 31, 1997, Cossaro, commented that plaintiff would be "much better off retiring . . . since she had the age and the service" (Nakis Aff. ¶ 13); (2) in or about January 12, 1999, Cossaro stated: "Your bones are getting old . . . look I gave you good advise, but you don't listen . . . you have the age. Why don't you get out?" (Nakis Aff. ¶ 51), and (3) on or around

September 29, 1999, Farrell commented that plaintiff had the requisite age and years of service and asked her why she did not retire (Nakis Aff. ¶¶ 51, 55).

Plaintiff appears to be conflating elements three and four of a _prima_ _facie_ case. Assuming for purposes of plaintiff's constructive discharge claim, that these e-mails and comments provide some evidence of the Postal Services's alleged discriminatory intention to force plaintiff to retire, such evidence would only help satisfy element four -- that the discharge occurred under circumstances giving rise to an inference of discrimination. For the reasons set forth below, these e-mails and comments are not sufficiently severe to sustain element three -- that plaintiff was constructively discharged. Furthermore, the record in this action would not allow a reasonable fact-finder to conclude that plaintiff's working conditions rose to the level of being so "intolerable" that a reasonable person in plaintiff's position would have felt compelled to retire.

Even if I were to consider all the allegations in plaintiff's 2000 EEO Complaint, in addition to the e-mails and comments noted above, the totality of conduct cited by plaintiff is insufficient to raise a genuine issue of material fact with respect to the presence of objectively intolerable working conditions. Plaintiff's 2000 EEO Complaint alleges the following additional incidents: (1) the relocation of her desk to an

34

isolated location because of a dispute over a window draft and the reassignment of plaintiff's prior desk to a younger, non-disabled, male employee, (2) the deletion of plaintiff's name from an e-mail distribution list which was corrected within one day of notice, (3) Stein's denying plaintiff's permission to retake the Excel training course she had already taken, (4) Stein's failure to assign plaintiff's meaningful work, (5) various disagreements with Farrell, Lee and Stein, including Stein's giving plaintiff's an order to return to her desk and Farrell telling her that she "cannot tell people what to do," (6) the Postal Service's demanding that plaintiff's pay for the annual leave which she requested to buy back, (7) the delay in providing her with an estimate of her disability annuity. All of these incidents, even if considered in conjunction with the e-mails and comments noted above, are not so pervasive and intoler-able that a reasonable person would have felt compelled to resign. See, e.g., Flaherty v. Metromail Corp., 98 Civ. 8611 (NRB), 2001 WL 868011 at *4 (S.D.N.Y. July 31, 2001), aff'd without published opinion, 59 Fed. Appx. 352 (2d Cir. 2002) (surveying much of the case law in this Circuit concerning constructive discharge and finding, in light of that authority, that plaintiff had failed to allege a viable constructive dis-charge claim), citing Spence v. Maryland Cas. Co., 995 F.2d 1147, 1149-52 (2d Cir. 1993) (finding no constructive discharge where a

plaintiff alleged dissatisfaction with the nature of assignments or unfair criticism), Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993) (finding no constructive discharge where a plaintiff alleged he was "ridiculed by his supervisor, . . . harangued by executives, . . . and suffered high blood pressure as a result of his supervisor's treatment") and Katz v. Beth Israel Medical Center, 95 Civ. 7183, 2001 WL 11064 at *12 (S.D.N.Y. Jan. 4, 2001) (finding no constructive discharge where a plaintiff alleged that she was told to retire, unfairly disciplined, yelled at by her supervisors and threatened with termination). See also Wright v. Goldman, Sachs & Co., 387 F. Supp.2d 314, 325 (S.D.N.Y. 2005) ("The constructive discharge standard is not met if the employee's working conditions were simply difficult or unpleasant. . . [A] working environment can be far from perfect and yet will not be held to be intolerable."); O'Dell v. Trans World Entertainment Corp., 153 F. Supp.2d 378, 393 (S.D.N.Y. 2001) ("[M]ere dissatisfaction with work assignments, unfair criticism, or working conditions that can be categorized as unpleasant, do not constitute a constructive discharge"). Although plaintiff may have personally felt that her work environment was intolerable, the test for constructive discharge is an objective one. See Johnson v. Potter, supra, 2005 WL 2257436 at *13.

Moreover, plaintiff's allegations pale in comparison to the conduct deemed actionable by the Court of Appeals for the Second Circuit in Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 85-89 (2d Cir. 1996). In Chertkova, the plaintiff's supervisors "called [plaintiff] into an office with closed doors and berated and yelled at [her] for hours," in addition, plaintiff was placed on formal probation and threatened that "she would be fired immediately if, over the course of two years, she did not maintain satisfactory performance levels, demonstrate satisfactory behavior, and improve her listening skills." Id. at 85, 89. Nakis, however, was never yelled at for hours nor was she threatened with disciplinary action or termination if she did not retire. In addition, the fact that nearly a year passed between plaintiff's leaving work on September 29, 1999 and her retirement in September 2000 is another fact that counsels against a finding of constructive discharge. See Cecil v. United States Postal Serv., 03 Civ. 8404 (JSR), 2004 WL 1886202 at *2 (S.D.N.Y. Aug. 24, 2004) ("[T]he fact that nearly a year passed between the start of [plaintiff's] sick leave and [her] date of retirement 'makes it less likely that the resignation was prompted by an atmosphere so intolerable that a reasonable person would have felt compelled to resign.'"), quoting Katz v. Beth Israel Med. Ctr., supra, 2001 WL 11064 at *12.

Finally, plaintiff's reliance on <u>Gruberg v. Board of
Educ.</u>, 3 F. Supp.2d 280, 284-85 (E.D.N.Y. 1998) -- the only
authority plaintiff cites in support of her constructive dis-
charge claim -- is misplaced.  Unlike the plaintiff in <u>Gruberg</u>,
Nakis has not adduced evidence of a pattern of severe and base-
less criticism by management over the quality of her performance,
nor "demands" that she retire, nor threats of disciplinary
charges or termination if she did not retire.  To the contrary,
Nakis concedes that defendant never threatened her with termina-
tion if she did not retire (O'Toole Ex. EA at 152-54).  <u>Compare
Katz v. Beth Israel Med. Ctr.</u>, <u>supra</u>, 2001 WL 11064, at *12
(finding no constructive discharge even after plaintiff "was told
to retire or work part-time if she did not like [her] situa-
tion"); <u>Alfieri v. Sysco Food Sers.</u>, 192 F. Supp.2d 14, 24
(W.D.N.Y. 2001) (finding no constructive discharge where plain-
tiff "was not being threatened with immediate discharge, demo-
tion, or a cut in pay, and her duties had not been changed");
<u>Leiman v. New York</u>, 98 Civ. 5538 (MHD), 2000 WL 1364365 at *10
(S.D.N.Y. Sept. 21, 2000), <u>aff'd</u> <u>without</u> <u>published opinion</u>, 9
Fed. Appx. 37 (2d Cir. 2001) ("The most common constructive
discharge case involves veiled or direct threats that failure to
resign will result in discharge."), <u>with</u> <u>Lopez v. S.B. Thomas,
Inc.</u>, 831 F.2d 1184, 1188 (2d Cir. 1987) (finding a triable
constructive discharge claim where defendant told plaintiff "he

would be fired at the end of the 90-day probationary period no matter what he did to improve his allegedly deficient performance"); Morris v. New York City Dep't of Sanitation, 99 Civ. 4376 (WK), 2003 WL 1739009 at *5 (S.D.N.Y. April 2, 2003) (finding a triable constructive discharge claim where plaintiff was told "that if he did not retire, he would be demoted down two levels resulting in a salary reduction of approximately $25,000 and attendant dilution of future pension benefits"). Nakis, however, was given salary increases, positive evaluations and performance awards (O'Toole Ex. EA at 154-58, 283-84). See, e.g., Ebanks v. Neiman Marcus Group, Inc., 04 Civ. 8350 (CM)(LMS), 2006 WL 287408 at *10 (S.D.N.Y. Feb. 3, 2006) (finding that plaintiff failed to establish a claim of constructive discharge and noting that plaintiff was consistently given positive reviews and raises of about 5% per year); Lumpkin v. H.E.L.P. USA, 02 CV 5475, 2005 WL 839669 at *5 (E.D.N.Y. Jan. 7, 2005) (finding no constructive discharge where plaintiff retained the same salary and pay grade after his transfer to a lower position within the organization, even if the transfer was subjectively regarded as a demotion).

Based on the foregoing, plaintiff has failed to adduce evidence sufficient for a reasonable fact-finder to conclude that plaintiff's working conditions rose to the level of being so intolerable that a reasonable person in Nakis's position would

have felt compelled to retire.  Therefore, there is no genuine
issue of material fact with respect to the presence of objec-
tively intolerable working conditions and, accordingly, plain-
tiff's constructive discharge claim is dismissed.

D.   Plaintiff's
     Prima Facie Case

Plaintiff also claims that she was the victim of
discrimination based on her age (AEDA) and disability (Rehabili-
tation Act), and subject to retaliation for her prior disability-
related EEO activities (Rehabilitation Act).  These claims are
properly analyzed under the now familiar framework first set
forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802
(1973).  Under McDonnell Douglas, plaintiff's claims are assessed
by way of a three-part, burden-shifting analysis:

> [T]he initial burden rests with the plaintiff to estab-
> lish a prima facie case of discrimination.  "A plain-
> tiff's establishment of a prima facie case gives rise
> to a presumption of unlawful discrimination" that then
> "shifts the burden of production to the defendant, who
> must proffer a 'legitimate, nondiscriminatory reason'
> for the challenged employment action." Woodman v.
> WWOR-TV, Inc., 411 F.3d [69, 76 (2d Cir. 2005)] (quot-
> ing Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d
> 87, 91 (2d Cir. 2001)).  If the defendant satisfies
> this burden, "the presumption of discrimination drops
> out" of the case, and the plaintiff must prove that a
> defendant's proffered reasons were not the true reasons
> for its actions but a pretext for discrimination. Roge
> v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir.
> 2001).

<u>Cross v. New York City Transit Auth.</u>, 417 F.3d 241, 248 (2d Cir. 2005) (explaining that <u>McDonnell Douglas</u> analysis "applies to ADEA claims"); <u>Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown</u>, 294 F.3d 35, 48-49 (2d Cir. 2002) (explaining that <u>McDonnell Douglas</u> analysis applies to both discrimination and retaliation claims under the Rehabilitation Act).

Defendant argues that plaintiff cannot establish a <u>prima facie</u> case of discrimination or retaliation under either the ADEA or the Rehabilitation Act (Def. Mem. 22-36).  Defendant further contends that, even if plaintiff can establish a <u>prima facie</u> case of discrimination or retaliation, she cannot rebut defendant's legitimate, nondiscriminatory reasons for its actions (Def. Mem. 36-38).

     1.   Plaintiff's <u>Prima Facie</u> Case
        of Discrimination and Retaliation
        <u>Under the ADEA and the Rehabilitation Act</u>

In order to establish a <u>prima facie</u> case of discrimination under either the ADEA or the Rehabilitation Act, a plaintiff must demonstrate:  (1) that she is a member of the class protected by the statute, (2) that she is qualified for the position, (3) that she suffered some adverse employment action, and (4) that the circumstances surrounding the adverse employment action give rise to an inference of discrimination.  <u>See</u> <u>Terry v. Ashcroft</u>, <u>supra</u>, 336 F.3d at 137-38 (outlining a <u>prima facie</u> case

41

of discrimination under the ADEA); Kinsella v. Rumsfeld, supra, 320 F.3d at 314 (outlining a prima facie case of discrimination under the Rehabilitation Act); Garvin v. Potter, 367 F. Supp.2d 548, 560 (S.D.N.Y. 2005) (same).

In order to establish a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must show:  (1) that she engaged in protected activity, (2) that the defendant was aware of this activity, (3) that the defendant took adverse action against the plaintiff, and (4) that there is a causal connection between the protected activity and the adverse action. See Treglia v. Town of Manlius, supra, 313 F.3d at 719; Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, supra, 294 F.3d at 54; Frasure v. Principi, supra, 367 F. Supp.2d at 255.

"The burden of establishing a prima facie case is not a heavy one.  One might characterize it as minimal." Carlton v. Mystic Transp. Inc., 202 F.3d 129, 134 (2d Cir. 2000), citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).  See also Woodman v. WWOR-TV, Inc., supra, 411 F.3d at 76 ("We have characterized plaintiff's prima facie burden as 'minimal' and 'de minimis.'"), quoting Zimmermann v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001).

Defendant claims that plaintiff's prima facie case is deficient in two respects.  First, defendant claims that the

conduct alleged by plaintiff does not rise to the level of
adverse employment actions (Def. Mem. 24-31). Second, defendant
argues that even if the conduct alleged rises to the level of
adverse employment actions, there is no evidence to support a
conclusion that the adverse actions occurred under circumstances
giving rise to an inference of discrimination or retaliation
(Def. Mem. 31-36).

In response, plaintiff asserts that the following three
incidents constitute adverse employment actions: (1) upon her
return to work in 1997, she was given menial assignments that did
not provide her with an opportunity for professional growth and
advancement; (2) on or about September 23, 1999, she was denied
her request to retake an Excel class she had already taken; (3)
upon her return to work in 1997, she was subjected to an arbi-
trary diminution in wages in that the Postal Service failed to
correct her leave records and charged the two hours per day she
was unable to work as leave without pay (Pl. Mem. 16-18).

Plaintiff further alleges that the incidents raised in
her 2000 EEO Complaint, when viewed in the aggregate,[3] constitute
an adverse employment action, namely: (4) in or about August
1999, she failed to receive notice of unspecified meetings with
her department as a result of her name being deleted from an e-

---

[3]Plaintiff concedes that the events raised in her 2000 EEO
Complaint "when viewed in isolation may not constitute an adverse
employment action . . ." (Pl. Mem. 18).

mail distribution list; (5) in August 1999, her desk was relo-
cated to an isolated cubicle, within the same office, that was
near facsimile machines and printers, and her prior desk was
given to a younger, non-disabled, male employee; (6) sometime
prior to her return to work in August 1999, "her computer was
tampered with" in that her name was deleted from an e-mail
distribution list; (7) the Postal Service allegedly falsified
documents with respect to her May 11, 1998 on-the-job injury; (8)
it took OPM until August 11, 1999 to provide her with a non-
binding estimate of her disability annuity;[4] (9) sometime prior
to her return to work in August 1999 her name was deleted from an
e-mail distribution list for approximately one day; (10) during
her last week of work, she had various disputes with Farrell, Lee
and Stein, including comments by Farrell that plaintiff "had the

_____

[4]Under 5 U.S.C. § 8347, OPM, not the Postal Service, is
exclusively charged with the administration of the Civil Service
Retirement System (CSRS).  See 5 U.S.C. § 8347(c) ("The Office
[of Personnel Management] shall determine questions of disability
and dependency arising under this subchapter.").

    Even if a benefits claimant is given erroneous advice by a
Government employee, this does not "give rise to estoppel against
the Government and so entitle the claimant to a monetary payment
not otherwise permitted by law."  Office of Pers. Mgmt. v.
Richmond, 496 U.S. 414, 416, 434 (1990).  Furthermore, it has
been held that "the denial of information does not amount to
adverse treatment."  Weber v. Hurtgen, 297 F. Supp.2d 58, 61
(D.D.C. 2003), citing Newkirk v. AAA Chicago Motor Club, 01 C
615, 2003 WL 21518546 at *6 (N.D. Ill. 2003) ("A mere failure to
provide information without any loss of actual or potential
benefit simply does not constitute an adverse employment action
under the law.").

age" and should retire, and (11) the Postal Service mishandled her 1998 and 1999 EEO complaints (Pl. Mem. 18-19).[5]

As a threshold matter, items 1, 3, 4, 5, 6, 7, 8, 9 and 11 all occurred prior to September 6, 1999. Therefore, for the reasons set forth in Section II.B.1 above, these items are time-barred and cannot be asserted in this action as specific, compensable acts of discrimination or retaliation under the ADEA and/or the Rehabilitation Act.[6]

Accordingly, items 1, 3, 4, 5, 6, 7, 8, 9 and 11 are time-barred and, therefore, cannot be used to establish an adverse employment action in this case. Turning to the two, non-time barred incidents alleged by plaintiff -- Stein's denying plaintiff permission to re-take an Excel course and the various disputes with Farrell, Lee and Stein during plaintiff's last week

---

[5]Buried in a subsequent section of her papers, plaintiff argues that the termination of her insurance benefits at some point after September 29, 1999 constitutes an adverse employment action. First, plaintiff only received notification that her insurance coverage would be discontinued because, in accordance with the Employee Labor Manual, plaintiff was on leave without pay status for 365 days. Furthermore, plaintiff's argument is belied by the fact that plaintiff applied for voluntary retirement on September 19, 2000 and, following her retirement, continued to receive health insurance. Thus, this does not constitute an adverse employment action.

[6]It also bears noting that items 1 and 3 were addressed already in Nakis I and were found to give rise to triable issues of fact in that action. See Nakis I, supra, 2004 WL 2903718 at *19.

of work, including comments about plaintiff's age -- I find that
only the former could constitute an adverse employment action.

        a.    Adverse
               Employment Action

An adverse employment action is a materially adverse
change in the terms and conditions of employment.  As explained
by the Honorable Shira A. Scheindlin, United States District
Judge:

> Examples of adverse employment actions are "discharge,
> refusal to hire, refusal to promote, demotion, reduc-
> tion in pay, and reprimand." Morris v. Lindau, 196
> F.3d 102, 110 (2d Cir. 1999).  The Second Circuit has
> also held that lesser actions may meet the adversity
> threshold, but it has not explicitly defined what
> quantum of lesser actions constitutes an adverse em-
> ployment action.  Id.  "Because there are no bright
> line rules as to which employment actions meet the
> threshold for 'adverse,' courts must make this determi-
> nation on a case-by-case basis." Wilburn v. Fleet Fin.
> Group, Inc., 170 F. Supp.2d 219, 237 (D. Conn. 2001),
> (quoting Richardson v. New York State Dep't of Corr.
> Serv., 180 F.3d 426, 446 (2d Cir. 1999)).  To sustain
> an adverse employment action, a plaintiff must "en-
> dure[] a 'materially adverse change' in the terms and
> conditions of employment." Galabya v. New York City
> Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2001) (quoting
> Richardson, 180 F.3d at 446).  In order for the ac-
> tion(s) to be "'materially adverse,' a change in work-
> ing conditions must be 'more disruptive than a mere
> inconvenience or an alteration of job responsibili-
> ties.'" Id. (quoting Crady v. Liberty Nat'l Bank and
> Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir.
> 1993)).  A "'material adverse change' is one that 'has
> an attendant negative result, a deprivation of a posi-
> tion or an opportunity.'" Campbell v. Grayline Air
> Shuttle, Inc., 930 F. Supp. 794, 802 (E.D.N.Y. 1996)
> (citations omitted).  While adverse employment actions
> extend beyond readily quantifiable losses, "not every-
> thing that makes an employee unhappy is an actionable

adverse action." <u>Phillips v. Bowen</u>, 278 F.3d 103, 117
(2d Cir. 2002).  <u>See</u> <u>also</u> <u>Bennett v. Watson Wyatt &
Co.</u>, 136 F. Supp.2d 236 (S.D.N.Y. 2001).

<u>Pimentel v. City of New York</u>, 00 Civ. 0326 (SAS), 2002 WL 977535
at *3 (S.D.N.Y. May 14, 2002), <u>aff'd</u> <u>without</u> <u>published</u> <u>opinion</u>,
74 Fed. Appx. 146 (2d Cir. 2003); <u>see</u> <u>Sanders v. New York City
Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004); <u>Lawson v.
Fed. Reserve Bank of New York</u>, 03 Civ. 1154 (PKC), 2004 WL
1497567 at *9 (S.D.N.Y. July 1, 2004).

Judged by the foregoing standards, item 2 -- the denial
of plaintiff's request to retake an Excel class she had already
taken -- appears to bear on plaintiff's opportunities for profes-
sional growth and career advancement.  <u>See</u> <u>Little v. Nat'l Broad.
Co.</u>, 210 F. Supp.2d 370, 381 (S.D.N.Y. 2002) ("Because this
training would have resulted in greater job security and more
overtime hours, the denial of such training may constitute an
adverse employment action.").  Defendant argues that this is not
an adverse employment action, however, citing:  <u>Martin v. Dupont
Flooring Systems, Inc.</u>, Civ.A. 3:01-CV-2189 (SRU), 2004 WL 726903
at *9 (D. Conn. Mar. 31, 2004), <u>aff'd</u> <u>without</u> <u>published</u> <u>opinion</u>,
125 Fed. Appx. 369 (2d Cir. 2005), and <u>Stephens v. State Univ. of
New York</u>, 11 F. Supp.2d 242, 249 (W.D.N.Y. 1998).  Defendant's
authority, however, does not support this conclusion.  In <u>Martin</u>,
the Honorable Stefan R. Underhill, United States District Judge,
held that the plaintiff could not rebut defendant's non-discrimi-

47

natory explanations for being denied training; however, Judge
Underhill did not conclude that a denial of training could never
constitute an adverse employment action.  <u>Martin v. Dupont
Flooring Systems, Inc.</u>, <u>supra</u>, 2004 WL 726903 at *9.  In
<u>Stephens</u>, the Honorable Carol E. Heckman, United States Magis-
trate Judge, found only that plaintiff's denial of training claim
turned on the fact that "no rational jury could find that plain-
tiff was denied training opportunities under circumstances giving
rise to an inference of discrimination."  <u>Stephens v. State Univ.
of New York</u>, <u>supra</u>, 11 F. Supp.2d at 249-50 (W.D.N.Y. 1998).
Thus, neither <u>Martin</u> nor <u>Stephens</u> support the conclusion that a
denial of training can never constitute an adverse employment
action.

The only remaining, non-time-barred adverse action
alleged by plaintiff is item 10 -- the various disputes with
Farrell, Lee and Stein during her last week of work, including
comments by Farrell that plaintiff "had the age" and should
retire.  Based on the standards outlined above in <u>Pimentel v.
City of New York</u>, <u>supra</u>, 2002 WL 977535 at *3, these comments do
not rise to the level of a materially adverse changes in the
terms and conditions of employment.

Accordingly, in light of the authorities cited above
coupled with plaintiff's <u>de minimis</u> burden at the first step of
the <u>McDonnell Douglas</u> test, I conclude that a jury could reason-

ably conclude that item 2 -- the denial of plaintiff's request to
retake an Excel class she had already taken -- was an adverse
employment action.  This denial of training claim is the only
timely, adverse employment action that plaintiff alleges.

### ii.  Inference of Discrimination

As noted above, a prima facie case not only requires
that plaintiff suffered an adverse employment action, but there
must also be evidence that would support a finding that the
adverse employment action occurred under circumstances that would
support an inference of discrimination or retaliation.

With respect to the fourth element of a prima facie
case, the nexus between the adverse employment action and plain-
tiff's age, disability or her engaging in protected activity and
need not be direct, nor is there any requirement that the dis-
criminatory or retaliatory animus be the sole cause of the
decision.

> To satisfy the fourth element, the causal relationship
> between the disability and the adverse employment
> decision need not be direct, and a plaintiff may estab-
> lish that the decision was motivated by his disability
> by demonstrating that "the disability caused conduct
> that, in turn, motivated" the employer's decision.
> Sedor v. Frank, 42 F.3d 741, 746 (2d Cir. 1994); see
> also Greene v. New York, 1998 WL 264838, *5 (S.D.N.Y.
> May 22, 1998).  Moreover, the Second Circuit has held
> that to establish a prima facie case of discrimination
> based on disability, a plaintiff need not prove that
> disability was the sole but-for cause for the
> employer's decision.  See Parker, 204 F.3d at 336-37.

Instead, a plaintiff "must show only that disability played a motivating role in the decision." Id. at 337. Morris v. City of New York, 153 F. Supp.2d 494, 500 (S.D.N.Y. 2001); see also Cifra v. General Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."); Morris v. New York City Dep't of Sanitation, supra, 2003 WL 1739009 at *6 (discussing the fourth element of a prima facie case in the context of an age discrimination claim).

"It is axiomatic that mistreatment at work . . . is actionable . . . only when it occurs because of an employee's . . . protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001), citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79-80 (1998). See also Leibovitz v. New York City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001) (sex discrimination); Gregory v. Daly, 243 F.3d 687, 692 (2d Cir. 2001) (sex discrimination). Hostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable. Brennan v. Metropolitan Opera Ass'n, supra, 192 F.3d 310, 318 (2d Cir. 1999) ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." (emphasis added)); Pronin v. Raffi Custom Photo Lab., Inc., 383 F. Supp.2d 628, 634 (S.D.N.Y. 2005). Personnel decisions that are based on

subjective factors or that are incorrect do not support a federal claim unless they are tainted, at least in part, by illegal discrimination. See Bussa v. Alitalia Linee Aeree Italiane, S.P.A., 02 Civ. 10296 (LAP), 2004 WL 1637014 at *6, *9 (S.D.N.Y. July 21, 2004).

At the first step of the McDonnell Douglas analysis, there are several ways in which a plaintiff can meet her de minimis burden of linking the adverse employment action to illegal discrimination. The burden can be satisfied by showing that: (1) plaintiff was treated differently than similarly situated employees outside of plaintiff's protected class; (2) the employer criticized plaintiff's performance in terms that are degrading and refer to plaintiff's protected class; (3) invidious comments by the employer that refer directly or indirectly to plaintiff's protected class, or (4) a "sequence of events leading to the [adverse employment action]." Abdu-Brisson v. Delta Air Lines, Inc., supra, 239 F.3d 456, 468 (2d Cir. 2001), quoting Chambers v. TRM Copy Ctrs. Corp., supra, 43 F.3d 29, 37 (2d Cir 1994). See also Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999) ("A plaintiff may support an inference of . . . discrimination by demonstrating that similarly situated employees [outside of plaintiff's protected class] were treated more favorably."). Where, as here, a plaintiff is alleging disability-based discrimination, an inference of discrimination

can also be drawn from an employer's failure to provide reason-
able accommodations.  Parker v. Columbia Pictures Indus., supra,
204 F.3d at 332 ("We have ruled that failure to make reasonable
accommodation, when the employee has satisfied the first three
elements of his claim, amounts to discharge 'because of' his
disability.").

      With respect to her discrimination claims, as noted in
Nakis I, there are questions of fact concerning defendant's
alleged failure to provide reasonable accommodations for plain-
tiff.  In addition, Nakis I also discussed that plaintiff has
offered some evidence that Cossaro said to her "your bones are
getting old . . . look I gave you good advice, but you don't
listen . . . you have the age.  Why don't you get out?" (Nakis
Aff. ¶ 51, see also ¶ 13).  This comment could be construed as a
reference to plaintiff's age, but it could also be construed as a
reference to plaintiff's disability.

      Given that a plaintiff's burden at the first step of
the McDonnell Douglas test is de minimis, I find that the forego-
ing evidence is sufficient to give rise to a question of fact
concerning plaintiff's discrimination claims under the ADEA and
the Rehabilitation Act.

      With respect to her retaliation claim, plaintiff again
cites to the e-mail between Tartaglia and Cossaro, dated January
12, 1998, as evidence of defendant's retaliatory animus to either

force plaintiff to retire or seek employment elsewhere (Pl. Mem. at 11-12, 26).  In the e-mail, Tartaglia states:

> I accept the basic premise that she is "trying to beat the system."
>
> You must resist the temptation to "get her" and instead appear gracious at every turn.  Get her an orthopedic desk and chair; change her schedule, set up the training ASAP; etc.  My point is -- she will see she can't beat us back and possibly retire.
>
> Nothwithstanding the foregoing, I would still contact Eddie to pursue your theory of other employment.

(1/98 Tartaglia E-mail).

A plaintiff can establish the "causal connection needed for proof of a retaliation claim," by offering evidence from which a reasonable fact-finder could conclude that "the protected activity was closely <u>followed</u> in time by the adverse action." <u>Cifra v. General Electric Co.</u>, <u>supra</u>, 252 F.3d at 216 (emphasis added).  This January 12, 1998 e-mail, however, predates the March 10, 1998 date plaintiff first sought informal EEO counseling with respect to her 1998 EEO complaint, as well as the letters plaintiff sent to her supervisors concerning their alleged failure to accommodate her disabilities[7] (<u>see</u> Nakis Aff.

_____

[7]The only letter that predates this e-mail is a November 4, 1997 letter from plaintiff's then attorney, Paul Kalker, reaffirming plaintiff's "conditional acceptance of re-employment" and the Postal Services's obligation to accommodate plaintiff's disability (Nakis Aff. ¶ 14 and Ex. 5 annexed thereto).  However, this letter appears to have been written prospectively rather than responsively because plaintiff did not return to work until

(continued...)

¶¶ 14, 21, 27-28, 34, 45, 53, 56 and Exs. 5, 10, 11, 29 annexed

thereto).  Therefore, as a matter of logic, plaintiff cannot use

this e-mail as evidence of defendant's retaliatory animus because

it predates, rather than follows, the date that she first engaged

in protected activity.  Moreover, plaintiff was not denied her

request to retake an Excel class until on or about September 23,

1999.  As a result, even employing the second date that plaintiff

sought informal EEO counseling on January 26, 1999 with respect

to her 1999 EEO complaint, the temporal gap between the protected

activity and the adverse employment action is too long -- eight

months -- to sustain an inference of discrimination.  <u>Compare</u>

<u>Clark County School Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)

(collecting cases in which three and four-month periods between

the protected activity and the adverse action were insufficient

to establish a casual connection), <u>with</u> <u>Quinn v. Green Tree</u>

<u>Credit Corp.</u>, 159 F.3d 759, 769 (2d Cir. 1998) (finding a period

of less than two months between the protected activity and the

alleged adverse action sufficient to establish causation).

<u>Accord</u> <u>Bolick v. Alea Group Holdings, Ltd.</u>, Civ. 3:03-CV-165

(PCD), 2005 WL 2621516 at *6 (D. Conn. Sept. 30, 2005) ("[C]ourts

are less likely to find causation if there is a 'long hiatus

---

[7](...continued)
December 22, 1997.  Thus, no alleged failure to accommodate
plaintiff's disabilities could have occurred prior to her actual
return to work on December 22, 1997.

between the protected activity and the [adverse action].'"),
quoting Honey v. County of Rockland, 200 F. Supp.2d 311, 321
(S.D.N.Y. 2002).

Based on the foregoing, plaintiff has not sustained her
burden of proffering evidence sufficient to give rise to a
question of fact concerning defendant's allegedly retaliatory
intent.

### iii. Summary

Accordingly, plaintiff has established a prima facie
case of discrimination based on her age (ADEA) and disability
(Rehabilitation Act), but only with respect to her claim that she
suffered an adverse employment action when she was denied her
request to retake an Excel training class.  Plaintiff has not
established a prima facie case of retaliation under the Rehabili-
tation Act.

> 2.   Plaintiff Fails to Rebut Defendant's
>      Legitimate, Non-Discriminatory Reason for Not
>      Allowing Plaintiff to Retake the Excel Course

Under McDonnell Douglas analysis, after a plaintiff
establishes a prima facie case of discrimination

>           [t]he burden then shifts to the employer to articulate
>           a legitimate, nondiscriminatory reason for its employ-
>           ment action.  411 U.S., at 802, 93 S.Ct. 1817.  If the
>           employer meets this burden, the presumption of inten-
>           tional discrimination disappears, but the plaintiff can
>           still prove disparate treatment by, for instance,

55

> offering evidence demonstrating that the employer's
> explanation is pretextual. <u>See</u> <u>Reeves v. Sanderson</u>
> <u>Plumbing Products, Inc</u>., 530 U.S. 133, 143, 120 S.Ct.
> 2097, 147 L.Ed.2d 105 (2000).

<u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44, 50 (2003); <u>St. Mary's</u>

<u>Honor Ctr. v. Hicks</u>, <u>supra</u>, 509 U.S. at 515-16; <u>Patterson v.</u>

<u>County of Oneida</u>, <u>supra</u>, 375 F.3d at 221 (same).

Defendant argues that he is still entitled to summary

judgment because the Postal Service had legitimate, nondiscrimi-

natory reasons for denying plaintiff's request to retake an Excel

training class.  Specifically, defendant offers the declaration

of Mark Stein in which he discusses his reasoning for not permit-

ting plaintiff to retake the Excel course.  First, Stein explains

that in considering plaintiff's request to take an Excel training

course, he "looked into what training plaintiff had taken and

discovered that [she] had already taken the course being offered"

(Declaration of Mark Stein, executed June 13, 2005 ("Stein

Decl."), at ¶ 24).  Stein notes that plaintiff had never told him

that she had taken the course already and that he denied her

request because he "believed she had been less than forthright"

with him (Stein Decl. ¶¶ 24-25).  Nevertheless, he indicated to

plaintiff that he would arrange for one of plaintiff's co-workers

-- Gerald Ross -- to assist her in learning Excel (Stein Decl. ¶

26; Letter from Mark Stein to Plaintiff, dated October 4, 1999,

annexed as Ex. BC to the O'Toole Decl.).  However, this tutoring

became unnecessary because plaintiff did not work in the office

for any significant period following Stein's decision (Stein Decl. ¶ 26). Finally, Stein states that he never approved any employee's request to retake a course they had already taken. (Stein Decl. ¶ 27).

Given the admissible evidence discussed above, defendant has proffered legitimate, nondiscriminatory reasons for not allowing plaintiff to retake the Excel course. See Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000) ("Defendants thus have articulated clear and specific reasons for [denying plaintiff to retake the course], supported by evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." (internal quotation marks omitted); Williams v. N.Y.C. Dep't of Sanitation, 00 Civ. 7371 (AJP), 2001 WL 1154627 at * 18 (S.D.N.Y. Sept. 28, 2001) ("This Court may not second-guess an employer's nondiscriminatory business decisions, regardless of their wisdom."). See also Paluh v. HSBC Bank USA, 409 F. Supp.2d 178, 194 (W.D.N.Y. 2006) (discussing that defendant had "articulated a legitimate explanation, corroborated by admissible evidence, for the denial of [plaintiff's] request for cross-training"); Martin v. Dupont Flooring Systems, Inc., supra, 2004 WL 726903 at *9 (finding that plaintiff could not rebut defendant's nondiscriminatory explanations for denying training). With respect to the neutral reasons offered by defendant for denying plaintiff's request to retake the training

course, it is significant that no other employee's were allowed to retake computer training courses they had already taken (Stein Decl. ¶ 27).

Since the defendant has proffered a legitimate nondiscriminatory reason for its denial of training decision, the burden of production shifts back to plaintiff to prove by a preponderance of the evidence that the true reason for the defendant's decision was discriminatory animus. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000); Ferraro v. Kellwood Co, supra, -- F.3d at --, 2006 WL 540340 at *2 ("Once the defendant provides such a [legitimate nondiscriminatory] reason, the plaintiff shoulders the burden of showing 'sufficient potential proof for a reasonable jury to find the profered legitimate reason merely a pretext' for discrimination."), quoting Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 443 (2d Cir. 1999). However, plaintiff has failed to offer any evidence demonstrating that defendant's above explanation is pretextual. Plaintiff's counsel merely makes the bald, omnibus assertion that defendant's nondiscriminatory reasons are "thin and insufficient to explain away its illegal treatment of plaintiff" (Pl. Mem. at 28). Counsel's assertion, however, is unsupported by admissible evidence. When a "plaintiff fails to offer any evidence to show that defendant's explanations are pretextual, there is no issue of material fact, and

summary judgment is appropriate." <u>Robertson v. Consol. Edison</u>
<u>Co. of New York, Inc.</u>, 94 CIV. 7396 (DLC), 1997 WL 65905 at *5
(S.D.N.Y. Feb. 13, 1997), <u>citing</u> <u>Holt v. KMI-Continental, Inc.</u>,
95 F.3d 123, 131 (2d Cir. 1996).

    3.  <u>Summary</u>

Although plaintiff established a <u>prima</u> <u>case</u> of discrim-
ination with respect to her only timely, adverse employment
action -- Stein's refusal to allow plaintiff to retake the Excel
course -- she has failed to offer any evidence demonstrating that
defendant's legitimate, nondiscriminatory reasons for denying
plaintiff's request to retake a computer training are pretextual.
Accordingly, to the extent that plaintiff is claiming that she
was discriminated against based on defendant denying her request
to retake an Excel training class, defendant's motion is
granted.[8]

IV.  <u>Conclusion</u>

---

[8]In light of the fact that summary judgment is granted with
respect to all of plaintiff's claims, there is no reason to
address defendant's final arguments concerning punitive,
liquidated and compensatory damages or the right to a jury trial.

IV.  Conclusion

Accordingly, for all the foregoing reasons, defendant's
motion for summary judgment is granted all respects and the
compliant is dismissed.

Dated:   New York, New York
         March 31, 2006

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

Copies mailed to:

Antonia Kousoulas, Esq.
Kousoulas & Associates, P.C.
41 Madison Avenue
40th Floor
New York, New York  10010-2202

Andrew D. O'Toole, Esq.
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
86 Chambers Street
3rd Floor
New York, New York  10007